**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

ANDREW JOSEPH, JR., as natural father, next friend and personal representative
of the Estate of Andrew Joseph, III, deceased,

Appellant/Cross-Appellee,

v.

CHAD CHRONISTER, in his official capacity as the Sheriff of Hillsborough
County, State of Florida, et al.,

Appellee/Cross-Appellant.

---

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 8:16-cv-00274-MSS-CPT

---

## BRIEF OF APPELLEE/CROSS-APPELLANT

April S. Kirsheman, Esq. (FBN 66291)
Hillsborough County Sheriff's Office
2008 East 8th Avenue
Tampa, FL 33605
(813) 247-8185
(813) 242-1817 (fax)
akirsheman@hcso.tampa.fl.us

Marie A. Borland, Esq. (FBN 849784)
Robert A. Shimberg, Esq. (FBN 816043)
HILL WARD & HENDERSON, P.A.
101 E. Kennedy Blvd., Suite 3700
Tampa, FL 3361-2231
813.221.3900 – Telephone
813.221.2900 – Facsimile
marie.borland@hwhlaw.com
robert.shimberg@hwhlaw.com

Attorneys for Appellee/Cross-Appellant

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel for Appellee/Cross-Appellant certifies that the following named persons and entities have an interest in the outcome of this case:

1. Adams and Reese LLP (A for Hillsborough County School Board)

2. Anulewicz, Christopher S. (Attorney for Plaintiff)

3. Balch & Bingham (Former Attorneys for Plaintiff)

4. Boos, Robert W. (Attorney for Hillsborough County School Board and Hillsborough County School District)

5. Borland, Marie A. (Attorney for Defendants Chad Chronister and Mark Clark)

6. Bower Rodriguez, P.A. (Former Attorneys for Plaintiff)

7. Brown, Christopher, E. (Attorney for Defendants Chad Chronister, Henry Echenique, Mark Clark, and Stephen Jones)

8. Chambers Pilon (Former Attorneys for Florida State Fair Authority)

9. Chester, Adrian (Defendant)

10. Chronister, Chad (Defendant)

11. Clark, Mark (Defendant)

12.     Clark, Thea G. (Former Attorneys for Defendants Chad Chronister, Henry

        Echenique, Mark Clark, John Does 1-X, and Stephen Jones)

13.     Collier, Kathryn E. (Attorney for Florida State Fair Authority)

14.     Cohen, Barry A. (Former Attorney for Plaintiff)

15.     Conahan, Sean M. (Attorney for Florida State Fair Authority)

16.     Darken, Kevin J. (Former Attorney for Plaintiff)

17.     Does, John 1-X (Defendant)

18.     Echenique, Henry (Defendant)

19.     Florida State Fair Authority (Defendant)

20.     Fulmer LeRoy & Albee, PLLC (Attorneys for Florida State Fair Authority)

21.     Fulton, Robert M. (Attorney for Defendants Chad Chronister and Mark

        Clark)

22.     Gaines, Michael W. (Former Attorney for Plaintiff)

23.     Gordillo, Jason G. (Former Attorney for Chad Chronister, Henry

        Echenique, Mark Clark, Stephen Jones, and Adrian Chester)

24.     Harrison, Chelsea C. (Attorney for Hillsborough County School Board and

        Hillsborough County School District)

25.     Hill, Ward & Henderson, P.A. (Attorneys for Defendants Chad Chronister

        and Mark Clark)

26.   Hillsborough County School Board (Defendant)

27.   Hillsborough County School District (Defendant)

28.   Hillsborough County Sheriff's Office (Attorneys for Defendants Chad Chronister, Henry Echenique, Mark Clark, and Stephen Jones)

29.   Jones, Stephen (Defendant)

30.   Joseph, Jr., Andrew (Plaintiff/Appellant)

31.   Kirsheman, April S. (Attorney for Defendants Chad Chronister, Henry Echenique, Mark Clark, and Stephen Jones)

32.   Lieser Skaff Alexander (Attorneys for Hillsborough County School Board)

33.   Litchfield Cavo, LLP (Former Attorneys for Defendant Chad Chronister, Henry Echenique, Mark Clark and Stephen Jones)

34.   Luks Santaniello Petrillo & Jones, LLC (Former Attorneys for Florida State Fair Authority)

35.   Manuel Menendez, Esq. (Mediator)

36.   Mazuchowski, Susan K. (Former Attorney for Florida State Fair Authority)

37.   McCoun III, The Hon. Thomas B. (Magistrate Judge)

38.   Menendez, Jr., Manuel (Mediator)

39. Murman, James A. (Attorney for Hillsborough County School Board and Hillsborough County School District)

40. Norbraten, Todd M. (Attorney for Plaintiff) (withdrawn)

41. Oliver, Deborah H. (Attorney for Hillsborough County School Board and Hillsborough County School District)

42. Perotti, Albert M. (Former Attorney for Defendant Chad Chronister, Henry Echenique, Mark Clark and Stephen Jones)

43. Pilon, Carrie Lambeth (Former Attorney for Florida State Fair Authority)

44. Pinellas County Sheriff's Office (Former Attorneys for Defendant Chad Chronister, Henry Echenique, Mark Clark and Stephen Jones)

45. Porcelli, Hon. Anthony E. (Magistrate Judge)

46. Roper & Roper, P.A. (Attorneys for Florida State Fair Authority)

47. Roper, Donovan A. (Attorney for Florida State Fair Authority)

48. Rubin & Rubin (Attorneys for Plaintiff)

49. Rubin, Guy Bennett (Attorney for Plaintiff)

50. Scriven, Hon. Mary S. (United States District Judge)

51. Shimberg, Robert A. (Attorney for Defendants Chad Chronister and Mark Clark)

52. Silloway, Patrick N. (Attorney for Plaintiff) (withdrawn)

53.    Todd Foster Law Group, LLC (Former Attorneys for Plaintiff)

54.    Tuite, Hon. Christopher P. (Magistrate Judge)

55.    Weekley Schulte Valdes Murman Tonelli (Attorneys for Hillsborough County School Board)

s/ *Marie A. Borland*
*Counsel for Appellee/Cross-Appellant*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellee/Cross-Appellant Mark Clark ("Corporal Clark") and Hillsborough County Sheriff Chad Chronister (the "Sheriff," "HCSO," or "Sheriff's Office") (collectively, "Defendants") agree with Appellant/Cross-Appellee Andrew Joseph, Jr. ("Joseph" or "Plaintiff") that oral argument will assist the Court. Defendants otherwise object to Joseph's "Statement Regarding Oral Argument." Eleventh Circuit Rule 18-1(c) permits a party to include a "*short* statement of whether or not oral argument is desired, and if so, reasons why oral argument should be heard" – not self-serving advocacy. The Court should therefore disregard Joseph's "Statement Regarding Oral Argument."

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................1

STATEMENT REGARDING ORAL ARGUMENT ........................................ i

TABLE OF CONTENTS.................................................................... ii

TABLE OF CITATIONS ...................................................................v

JURISDICTIONAL STATEMENT ........................................................1

RESTATEMENT OF THE ISSUES ......................................................2

STATEMENT OF THE CASE.............................................................3

    I.    Course of Proceedings and Disposition Below....................................3

    II    Statement of Facts. ...............................................................11

    III.    Standard of Review. ..............................................................21

        A.    Joseph's Appeal. ......................................................21

        B.    Sheriff's Cross-Appeal.................................................22

            1.    Jury Instruction. .............................................22

            2.    Sovereign Immunity. ........................................22

            3.    Admission of Evidence.......................................22

SUMMARY OF ARGUMENT ...........................................................23

        A.    Joseph's Appeal. ......................................................23

        B.    Sheriff's Cross-Appeal.................................................23

            1.    Jury Instruction. .............................................23

            2.    Sovereign Immunity. ........................................24

            3.    Admission of Evidence.......................................25

ARGUMENT ...................................................................................26

THE DISTRICT COURT CORRECTLY DENIED PLAINTIFF'S
MOTION FOR JUDGMENT AS A MATTER OF LAW AND
MOTION FOR NEW TRIAL.....................................................26

    A.    The District Court Correctly Denied Plaintiff's Motion For
        Judgment as a Matter of Law Because the Evidence Was
        Legally Sufficient to Support the Jury's Verdict in Favor
        of Corporal Clark. ....................................................27

        1.    Ejection Form. .................................................29

        2.    Trial Testimony. .............................................32

    B.    The District Court Correctly Denied Plaintiff's Motion For
        New Trial On Issues Remaining As To His Section 1983
        Claim Against Corporal Clark. ....................................36

ARGUMENT ON CROSS-APPEAL .....................................................37

    I.    THE DISTRICT COURT ERRED AS A MATTER OF LAW
        WHEN IT INSTRUCTED THE JURY THAT THE
        PARENTAL NOTIFICATION AND RELEASE
        REQUIREMENTS OF CERTAIN UNIDENTIFIED
        STATUTES CREATED A LEGAL "DUTY" IN
        NEGLIGENCE ON THE PART OF THE SHERIFF AND
        THAT THE SHERIFF'S "VIOLATION" OF THE STATUTES
        WAS "EVIDENCE OF NEGLIGENCE."..........................37

        A.    The District Court's Instruction was Legal Error Because
            the Parental Notification and Release Statutes Are Not
            Applicable Under the Facts of this Case and Do Not Create
            a Private Right of Action. ...........................................38

        B.    The Court Should Certify a Question Regarding the
            Applicability of the Statutes to the Florida Supreme Court
             ...................................................................49

    II.    THE SHERIFF IS ENTITLED TO SOVEREIGN IMMUNITY..…...52

III.   THE DISTRICT COURT ERRED IN ADMITTING HEARSAY
       TESTIMONY        REGARDING        STATEMENTS
       PURPORTEDLY    MADE    BY    AN    UNIDENTIFIED
       "OFFICER." .............................................................................56

CONCLUSION ....................................................................................60

CERTIFICATE OF COMPLIANCE ......................................................61

CERTIFICATE OF SERVICE ..............................................................62

# TABLE OF CITATIONS

**CASES**                                                                    **PAGE(S)**

*Alderman v. Lamar*,
   493 So. 2d 495 (Fla. 5th DCA 1986) .................................................................45

*Allstate Ins. Co. v. James*,
   845 F.2d 315 (11th Cir. 1988) .........................................................................59

*America v. Mills*,
   654 F. Supp. 2d 28 (D.D.C. 2009) ...................................................................29

*Anderson v. Ferreira*,
   Case No. 6:19-cv-2014-JA-GKK, 2021 WL 3603049 (M.D. Fla. 2021)...........26

*Borden v. East-European Ins. Co.*,
   921 So. 2d 587 (Fla. 2006) ...............................................................................42

*Canton v. Kmart Corp.*,
   470 F. App'x 79 (3rd Cir. 2012).................................................................. 58, 59

*\*Chaney v. City of Orlando*,
   291 F. App'x 238 (11th Cir. 2018) ...................................................................27

*Chevron U.S.A., Inc. v. Forbes*,
   783 So. 2d 1215 (Fla. 4th DCA 2001)...............................................................46

*\*Chmielewski v. City of St. Pete Beach*,
   890 F.3d 942 (11th Cir. 2018); .........................................................................27

*\*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
   158 F.3d 548 (11th Cir. 1998) ..................................................................... 22, 58

*Colorificio Italiano Max Meyer, S.P.A. v. S/S Hellenic Wave*,
   419 F.2d 223 (5th Cir. 1969) ............................................................................57

*\*Dep't of Health and Rehabilitative Servs. v. B.J.M*,
   656 So. 2d 906 (Fla. 1995) .......................................................................... 52, 53

*District of Columbia v. Wesby*,
   138 S. Ct. 577 (2018)........................................................................................28

*Doerr v. State*,
    383 So. 2d 905 (Fla. 1980) ...................................................................47

*Forsythe v. Longboat Key Beach Erosion Control Dist.*,
    604 So. 2d 452 (Fla. 1992) ...................................................................43

*Fox v. Graff*,
    276 F. App'x 936 (11th Cir. 2008) .......................................................30

*Freehauf v. School Bd. of Seminole Cnty.*,
    623 So. 2d 761 (Fla. 5th DCA 1993)................................... 37, 43, 44, 45, 46, 47

*Fuller v. Mort. Elect. Regis. Systems, Inc.*,
    888 F. Supp. 2d 1257 (M.D. Fla. 2012)................................................42

*Gill as Next Friend of K.C.R v. Judd*,
    941 F.3d 504 (11th Cir. 2019) ..................................................... 21, 26

*Glenn v. Lanier*,
    No. 3:09cv1/MCR/MD, 2010 WL 1380164 (M.D. Fla. 2010) .........................28

*Illinois v. Gates*,
    462 U.S. 213 (1983)................................................................. 28, 33

*In re NRP Lease Holdings, LLC*,
    20 F.4th 746 (11th Cir. 2021) ..............................................................50

*J.G. v. State*,
    883 So. 2d 915 (Fla. 1st DCA 2004) ....................................................47

*Jackson-Shaw Co. v. Jacksonville Aviation Auth.*,
    508 F.3d 653 (11th Cir. 2007) ..............................................................50

*Johnson v. Conner*,
    720 F.3d 1311 (11th Cir. 2013) ............................................................22

*Joseph v. Chronister*,
    8:16-cv-274-T-35CPT, 2020 WL 13657218 (M.D. Fla. 2020).................. 53, 54

*Joseph v. Chronister*,
    No. 20-11073, 2021 WL 4739608 (11th Cir. 2021).........................................35

*Lozman v. City of Riviera Beach,*
681 F. App'x 746 (11th Cir. 2017), *vacated on other grounds*,
138 S. Ct. 1945 (2018).........................................................................26

*\*Mamani v. Sanchez Bustamante,*
968 F.3d 1216 (11th Cir. 2020) .........................................................58

*Manfre v. Shinkle,*
184 So. 3d 641 (Fla. 5th DCA 2016)...................................................45

*\*Miller v. Keating,*
754 F.2d 507 (3rd Cir. 1985) ........................................................ 58, 59

*\*Neely v. State,*
126 So. 3d 342 (Fla. 3d DCA 2013)....................................................47

*Newton v. Ryder Transp. Services, Inc.,*
206 F.3d 772 (8th Cir. 2000) ..............................................................29

*\*Nieves v. Bartlett,*
139 S. Ct. 1715 (2019)...................................................................28, 30

*Oliver v. Orange Cnty., Fla.,*
456 F. App'x 815 (11th Cir. 2012) ................................................ 35, 36

*People v. Strausberger,*
503 N.E.2d 832 (Ill. App. 2d 1987)....................................................29

*\*Pollock v. Fla. Dep't of Hwy. Patrol,*
882 So. 2d 928 (Fla. 2004) .................................................................52

*\*Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.,*
780 F.3d 1327 (11th Cir. 2015) ..........................................................50

*\*Rankin v. Evans,*
133 F.3d 1425 (11th. Cir. 1998) .........................................................26

*Reeves v. Sanderson Plumbing Products, Inc.,*
530 U.S. at 135 (2000).........................................................................33

*Reid v. Neal,*
688 F. App'x 613 (11th Cir. 2017).......................................................26

*Roberts v. Shop & Go, Inc.*,
    502 So. 2d 915 (Fla. 2d DCA 1986) ................................................................46

*Schwartz v. Wal-Mart Stores, Inc.*,
    155 So. 3d 471 (Fla. 5th DCA 2015) ..............................................................55

*Shannon v. Bellsouth Telecommunications, Inc.*,
    292 F.3d 712 (11th Cir. 2002) ........................................................................27

*T. Harris Young & Assoc. v. Marquette Electronics, Inc.*,
    931 F.2d 816 (11th Cir. 1991) ........................................................................56

*Trianon Park Condo. Ass'n v. City of Hialeah*,
    468 So. 2d 912 (Fla. 1985) .............................................................................53

*United States v. Burton*,
    288 F.3d 91 (3rd Cir. 2002 .............................................................................28

*United States v. Clark*,
    32 F.4th 1080 (11th Cir. 2022) .......................................................................31

*United States v. Grigsby*,
    111 F.3d 806 (11th Cir. 1997) ....................................... 22, 37, 38, 42, 48, 49

*United States v. Issa*,
    265 F. App'x 801 (11th Cir. 2008) .................................................................57

*United States v. Mayweather*,
    991 F.3d 1163 (11th Cir. 2021) ......................................................................49

*United States v. Melgen*,
    967 F.3d 1250 (11th Cir. 2020) ......................................................................22

*United States v. Moore*,
    76 F.4th 1355 (11th Cir. 2023) .......................................................................22

*United States v. Robinson*,
    544 F.2d 110 (2d. Cir. 1976) ..........................................................................57

*United States v. Sallins*,
    993 F.2d 344 (3rd Cir. 1993) ..................................................................... 57, 58

*United States v. Shah,*
   981 F.3d 920 (11th Cir. 2020) ............................................................22

*Unruh v. State,*
   669 So. 2d 242 (Fla. 1996) .................................................................43

*Wallace v. Dean,*
   3 So. 3d 1035 (Fla. 2009) ........................................................... 52, 53

*\*Washington v. Howard,*
   25 F.4th 891 (11th Cir. 2022) .............................................................27

## STATUTES

*\*§ 616.185, Fla. Stat. ............................................. 12, 23, 28, 31, 34, 36

*\*§ 768.28,  Fla. Stat. ..........................................................................52

§ 985.101, Fla. Stat. ............................... 4, 5, 8, 17, 37-41, 43-45, 47, 49, 50, 52, 54

§ 985.115, Fla. Stat. .......................4, 6, 8, 17, 37, 38, 41, 43-45, 47, 49, 50, 52, 54

28 U.S.C. § 1291 ...............................................................................1

42 U.S.C. § 1983 ...............................................................................3

## RULES

Fed. R. Civ. P. 50 ..............................................................................27

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over Joseph's appeal and the Sheriff's cross-appeal pursuant to 28 U.S.C. § 1291.

## RESTATEMENT OF THE ISSUES

**I.      Joseph's Appeal.**

Whether the District Court correctly denied Joseph's Motion for Judgment as a Matter of Law and Motion for New Trial after determining that the evidence at trial was legally sufficient to support the jury's verdict in Corporal Clark's favor on Joseph's Section 1983 claim?

**II.      Sheriff's Cross-Appeal.**

**A.**      Whether the District Court erred as a matter of law in instructing the jury that the Sheriff's Office had a legal "duty" to notify Andrew's parents of his ejection and to release him to their custody under statutes it failed to identify, that the Sheriff's Office "violated" the statutes, and that the "violations" may be considered as "evidence of negligence"?

**B.**      Whether the Sheriff is entitled to sovereign immunity?

**C.**      Whether the District Court erred in permitting hearsay statements purportedly made by an unidentified "officer"?

**STATEMENT OF THE CASE**

Joseph's "Nature of the Case" is biased, argumentative, and contradicted by the record, and should be disregarded.

**I.      Course of Proceedings and Disposition Below.**

Plaintiff Joseph initiated the underlying action as father and personal representative of the Estate of his son, Andrew Joseph, III ("Andrew"), who was tragically killed by a motorist while running across an interstate highway (I-4) approximately two hours after he was ejected from the ticketed portion of the Florida State Fair on the evening of "Student Day," February 7, 2014.

In the operative Third Amended Complaint, Joseph alleged a state wrongful death claim against the Sheriff for vicarious liability ("Count I"), a state wrongful death claim against the Florida State Fair Authority ("FSFA") for vicarious liability ("Count II"), a state wrongful death claim against the FSFA for direct liability ("Count III"), a deprivation of civil rights claim against the Sheriff in his official capacity under 42 U.S.C. § 1983 ("Count IV"), and claims against Corporal Clark, Lieutenant Stephen Jones, and Deputy Henry Echenique in their individual capacities under 42 U.S.C. § 1983 ("Counts V-VII"). (Dkt. 143.)

The District Court entered summary judgment in favor of the Sheriff, Deputy Echenique, and Lieutenant Jones on the Section 1983 claims in Counts IV, V and VII based on qualified immunity on February 21, 2020. (Dkt. 283.) The Court denied

summary judgment on the Count I wrongful death claim against the Sheriff, the Count II and III wrongful death claims against the FSFA, and the Count VI Section 1983 claim against Corporal Clark. (*Id.*)

Joseph settled his claims against the FSFA on September 9, 2022. (Dkt. 393.) The case proceeded to trial on the wrongful death claim against the Sheriff (Count I), and the Section 1983 claim against Corporal Clark (Count VI), from September 12, 2022 through September 22, 2022. (Dkt. 453-459; 487.)

The wrongful death claim was premised on the Sheriff's vicarious liability for the alleged negligence of Sheriff's deputies in connection with Andrew's processing and ejection from the ticketed portion of the Fair. The claim focused predominately on whether the parental notification and release requirements of sections 985.101(3) and 985.115(2), Florida Statutes, created a legal "duty" in negligence on the part of the Sheriff's Office. Although the District Court initially determined the statutes created a legal duty for purposes of summary judgment, the Court agreed during the pre-trial conference to permit the parties to present testimony regarding the applicability of the statutes to the facts of the case, and indicated the Court was undecided on whether a statutory "duty" instruction would be given. (Dkt. 38 at 78-79.) As a result, Plaintiff's wrongful death case and the Sheriff's defense focused predominately on the applicability of the statutes under the circumstances of the case.

Retired Master Sergeant Todd Anthony testified that the section 985.101(3) parental notification requirement does not apply to someone who is not arrested. (Dkt. 454 at 80.) He explained that the "four conditions" under which a juvenile is "taken into custody" for purposes of section 985.101(1)(a)-(d) and where parental notification is therefore triggered under section 985.101(3) do not apply to this case. (*Id.* at 139-43.) He further testified that parental notification is only required when a juvenile is "arrested or transported to a receiving facility." (*Id.* at 144.)

Retired Captain Kyle Cockream similarly testified he was "not aware of any statute" requiring parental notification "when a juvenile is trespassed or ejected." (Dkt. 455 at 111.) Cockream further testified he was not aware of a "policy or procedure" that "gave guidance to deputies in the processing area to call parents," and agreed that "some training should have been given to the deputies to call the parents of the children that were ejected" *if* section 985.101(3) applied. (*Id.* at 135.) He explained that, when a juvenile is trespassed or ejected, whether at a Fair or a Wal-Mart, the Department of Juvenile Justice typically does not get involved, and that the four circumstances applicable to taking a child "into custody" under section 985.101(1)(a)-(d) for purposes of parental notification are not triggered. (*Id.* at 139-40.)

The District Court addressed the issue of "custody," stating the Court was "happy to consider" an argument that the juveniles were "in custody" but "not

pursuant to a lawful arrest" which "somehow [took] them out of the parameters of 985.115." (Dkt. 455 at 127.) The Court further acknowledged that the Sheriff's Office "cannot be held liable for its failure to train and failure to plan," but only "for its officer's discharging their duty in a negligent way." (*Id*. at 131.)

Sheriff's representative, Major Frank Losat, also testified that the parental notification and release requirements of Chapter 985 are not applicable to ejections at the Fair. (Dkt. 457 at 56-57.) Retired Patrol Sergeant Scott Bell similarly clarified that a law enforcement officer would be required to call parents after interacting with a juvenile upon their arrest – not an ejection. (Dkt. 458 at 63.)

Defense expert Ken Katsaris, who has been certified to train law enforcement officers in Florida for approximately 40 years, testified that Andrew was not "in custody" for purposes of the parental notification and release requirements of Chapter 985 because he was not "charged with a crime" or "transported to the Juvenile Assessment Center." (Dkt. 459 at 26.) The District Court asked Mr. Katsaris to identify the statute that "backs your training of officers that it is in their discretion to notify parents." (*Id.* 60.) Mr. Katsaris responded:

> It is encompassed in 985 where custody is defined as when an officer has made an arrest and is going to be transporting to the Juvenile Assessment Center where parents will be notified. Anything less than that is a release with counseling or simply asking them to go home and leave the area. The definition itself of custody means that you are transporting to another location where that juvenile will be held. Without the transportation to another location, meaning the Juvenile

Assessment Center, where they notify the parents, then that is the interpretation of – everything else is a release without notification.

(*Id.* at 60-61.) When asked by the District Court whether the statutory definition of "taken into custody" changed or "inform[ed] [his] opinion," Mr. Katsaris responded it was "clear" to him that the statute refers to "transport," which is the "interpretation" of the International Association of Chiefs of Police, and that "unless that child is going to be transported, kept over 6 hours, and booked into the jail for an arrest," the statute does not apply. (*Id.* at 62.) When asked by the Court to read the definition of "custody," Mr. Katsaris again clarified the context of the Florida Legislature's reference to "custody" as applying to a juvenile who "is arrested," not "simply a detention and release" as in this case. (*Id.*)

At the close of Plaintiff's evidence, defense counsel made an oral motion under Rule 50. (Dkt. 457 at 186-220.) As to the Section 1983 claim, counsel argued that Plaintiff had failed to meet his burden of proving by a preponderance of the evidence that Corporal Clark acted without probable cause in detaining Andrew on the Midway. (*Id.* at 186-87.) As to the wrongful death claim, counsel argued that the Sheriff was entitled to sovereign immunity because Plaintiff failed to present evidence of any negligence on the part of Sheriff's deputies in processing and ejecting Andrew or that any alleged negligence was the cause of any harm. (*Id.* at 216.) Counsel further challenged the admission of hearsay statements attributable to

an unidentified "officer" at the Gate 4 ejection site as hearsay and unduly prejudicial. (*Id.* at 218-220.)

The District Court denied Defendants' Rule 50 motion. (Dkt. 457 at 220.) At the close of the evidence, Defendants renewed their Rule 50 motion, adopting their earlier arguments, and adding that Plaintiff had failed to satisfy his burden of proving that Corporal Clark either initially or intentionally detained Andrew on the Midway without probable cause. (Dkt. 459 at 77-78.) Plaintiff also moved for judgment as a matter of law. (Dkt. 459 at 83.) As to the wrongful death claim, counsel argued that Sheriff's deputies were negligent in violating the parental notification and release requirements of Florida Statutes sections 985.101(3) and 985.115(a)(2). (*Id.* at 83-85.) As to the Section 1983 claim, counsel argued that no reasonable jury, based on the evidence presented at trial, could conclude that Corporal Clark had probable cause to detain Andrew on the Midway. (*Id.* at 86.)

Defense counsel challenged Plaintiff's reliance on the parental notification and release statutes, and requested that the Court deny Plaintiff's Rule 50 motion on the wrongful death claim. (Dkt. 459 at 88-91, 104-108.) After permitting the defense to present substantial testimony refuting the applicability of the statutes to the circumstances of the case, the District Court instead concluded that Andrew was "taken into custody" for purposes of the parental notification and release statutes. (*Id.* at 101;114-16.) After additional discussion regarding Plaintiff's burden of proof

8

on the Section 1983 claim, the District Court held the issue of probable cause in abeyance pending the jury's verdict. (*Id.* at 116.)

Over objection, the District Court then undermined the credibility of the Sheriff's witnesses and the Sheriff's defense by instructing the jury not only that the parental notification and release statutes (which the Court failed to identify, much less quote in its instruction) created a "duty" on the part of the Sheriff's Office under the facts of the case, but also that the Sheriff's Office "violated" those provisions and that the "violations may be considered as evidence of negligence." (Dkt. 463 at 14.) Instead of identifying and quoting the actual language of the statutes, the District Court summarized and interpreted the statutes and their purported applicability to the case as follows:

> There are several statutes that address the duties that Hillsborough County Sheriff's Office owed to Andrew. Andrew was "taken into custody" when he was seized from the midway by Officer Clark and taken to the area where he was further processed. Florida law required Hillsborough County Sheriff's Office to notify or attempt to notify Andrew's parent, guardian or legal custodian and to continue such attempt until a parent, guardian, or legal custodian of Andrew was notified or he was delivered to the Department of Juvenile Justice.

> Additionally, Florida law required Hillsborough County Sheriff's Office to attempt to release Andrew to his parent, guardian, or legal custodian, or if Andrew's parent, guardian, or legal custodian was unavailable, unwilling, or unable to provide supervision for him, to any responsible adult.

> Hillsborough County Sheriff's Office violated both of these provisions. These violations may be considered as evidence of negligence. Neither is conclusive evidence of negligence. You may consider these facts,

together with the other facts and circumstances, in deciding whether Hillsborough County Sheriff's Office was negligent.

(*Id.*)

Plaintiff's counsel, in turn, took advantage of the instruction's prejudicial effect on the credibility of the Sheriff's witnesses, repeatedly calling the defense witnesses "liars" in closing argument. (Dkt. 487 at 66; 71.) Counsel stated:

> [T]hey all stood up and lied to you. They lied to your face…Every one of them stood up there and lied to you in the face of that clear statute.

(Dkt. 487 at 66.) Counsel went on to argue: "You heard testimony from the Sheriff…I'm going to lie to you about what the law is…" (*Id.* at 71.)

The jury returned its verdicts on September 22, 2022. (Dkt. 437; 438.) On the Section 1983 claim, the jury answered "No" when asked on the verdict form whether Corporal Clark "intentionally committed acts that violated [Andrew's] right to be free from an unconstitutional seizure." (Dkt. 438.) On the wrongful death claim, the jury answered "Yes" when asked on the verdict form whether there was "negligence on the part of [the Sheriff], in his official capacity as the Sheriff of Hillsborough County, which was a legal cause of [Andrew's] death." (Dkt. 437.)

Plaintiff filed a renewed Motion for Judgment as a Matter of Law and Motion for New Trial on the issue of probable cause on his Section 1983 claim against Corporal Clark after the verdict. (Dkt. 443.) Following briefing (Dkt. 447, 448, 450, 451, 452), the District Court entered an Order denying the motion on February 3,

2023. (Dkt. 461.) The Court noted that "Plaintiff had the burden of proving, by a preponderance of the evidence, the *absence* of probable cause to detain Andrew." (*Id.*) (emphasis in original). The Court went on to note: "Importantly, it was not the burden of the Defendant to prove the existence of probable cause." (*Id.*) Concluding that the "jury's finding that Plaintiff failed to prove the absence of probable cause is supported by the evidence adduced at trial," and that "there was sufficient evidence from which the jury could have found that Clark had probable cause to seize Andrew," the Court denied Plaintiff's Motion for Judgment as a Matter of Law and further concluded that "no new trial is warranted." (*Id.* )

## II.     Statement of Facts.

On February 7, 2014, fourteen year old Andrew Joseph, III was dropped off with four friends at Gate 3 of the Florida State Fair ("Fair") at approximately 6:30 p.m. to attend the Fair's annual "Student Day." (Dkt. 335.) Andrew's father, Plaintiff Joseph, had no concern about Andrew going to the Fair without adult supervision because, in his words, Andrew was "almost like a man-child – he was very responsible." (Dkt. 457 at 83.)

Crowds on Student Day are larger than usual, particularly during the evening, where Fair patrons are often "shoulder-to-shoulder." (Dkt. 453 at 138.) In light of the circumstances and size of the crowds on Student Day 2014, the Fair was staffed by several hundred law enforcement officers, both on-duty and off-duty, as well as

a security company. (Dkt. 454 at 48-49.) The law enforcement officers were tasked with patrolling the Midway to ensure the safety of Fairgoers, and were authorized under the Florida Statutes to either eject or arrest individuals engaged in behavior that disrupted the orderly conduct of the Fair. *See* § 616.185, Fla. Stat. Policies and procedures for handling those juveniles fell within the responsibility of the FSFA and of the Homeland Security Division. (Dkt. 455 at 95.)

Fairgoers subject to ejection for disorderly conduct were escorted to a designated "processing area" in close proximity to the Midway, and then driven by a law enforcement officer to an ejection site outside of the ticketed section of the Fair but still within Fair property. The ejection site was adjacent to Gate 4 of the Fair, and was a "safe" place. (Dkt. 454 at 39.) Sergeant Anthony testified that the site was selected because it was the closest site to the processing area; the Gate 4 guard shack was staffed by more law enforcement and private security personnel than any other gate; it was well lit; a public parking area at the site allowed the public to come onto the property all the way up to the Gate 4 perimeter or guard shack; and it was staffed by the Sheriff's Bomb Team and K-9 personnel. (Dkt. 455 at 55-56.)

Deputy David Cappel, a Sheriff's deputy who worked "off duty" at the Orient Road Guardhouse the evening of Student Day to assist Andy Frain Security, confirmed the "drop-off area was lighted." (Dkt. 458 at 142.) He also recalled "a group of four juveniles" approaching the guard house "needing to call home," and

"instructing them to ask Andy Frain [Security] to use the phone to call." (*Id.*) Deputy Cappel allowed the juveniles to "put their possessions on [his] trunk." (*Id.*) The testimony at trial was unrefuted that ejected juveniles were permitted to remain at Gate 4 and were never ordered off Fair property. (Dkt. 454 at 41-42.)

Andrew and Corey Thornton were two of the hundred or so juveniles who were either ejected or arrested the evening of February 7, 2014. Thornton was with Andrew from the time the juveniles were dropped off at the Fair until the accident on the interstate. (Pl. Br. at 6.) Thornton testified that Andrew was talking to a girl named "Jordan" on the Midway when the juveniles spotted two friends being escorted by deputies. (Dkt. 456 at 76-77.) Thornton recalls Andrew "picking up the hat" of one of his friends and saying, "[t]hat's my cousin," and heard Andrew talking to the officers. (Dkt. 456 at 77-84.)

No one testified that "Andrew saw [his friend's] ball cap fall off his head as [his friend] was 'slammed' to the ground by a deputy in an area of the midway that was not crowded." (Pl. Br. at 6.) Thornton did not testify as to what "Andrew saw" or that anyone was "slammed" to the ground, and the overwhelming evidence at trial confirmed that the area of the Midway where the juveniles were detained was heavily "crowded." Plaintiff's assertion that Andrew simply "walked up" to his friend to "return his cap" is also contradicted by the evidence, which demonstrated overwhelmingly that Andrew was "running" towards deputies in the process of

13

detaining other juveniles when he was detained. (Dkt. 458 at 125-26; 129-33.) Nor was Thornton the "only eyewitness to Andrew's actions immediately before and as he approached the deputy who had custody" of other juveniles. (Pl. Br. at 6-7.) Andrew's friend, Jordan Porrino, reiterated multiple times that she personally witnessed Andrew "running" on the Midway after his friends and the deputies. (Dkt. 458 at 125-26; 129-33.)

Thornton testified he was "grabbed" by Corporal Clark on the Midway, but was unable to identify the officer who detained Andrew. (Dkt. 456 at 84-85.) Sergeant Scott Bell, however, testified that <u>he</u> detained Thornton, not Corporal Clark. (Dkt. 458 at 35; 37-38.) Sergeant Bell recalled Thornton because of the bright yellow "M&M jacket" he was wearing, and remembered seeing Thornton "coming towards" him along with crowds that were "running." (*Id*.) Sergeant Bell estimated the size of the group "running" on the Midway at 30 to 40 individuals, and the speed of the group as "more than a jog." (*Id*. at 41.)

Sergeant Bell told Thornton he was being removed from the Midway for running, which he said affects the safety and security of the Fair given the size of the crowd. (*Id*. at 42-44.) Sergeant Bell did not recall seeing anyone "picking up a hat." (*Id*. at 48-49.) When asked to respond to a jury question regarding how he could tell Thornton was running with a group on the Midway and not walking through a busy crowd, Sergeant Bell testified: "It was obvious. Like when I had first laid eyes

on him, he was keeping up with the crowd, he was basically in a full-stride run and not a sprint, but a – but a run, maintaining his same speed with the crowd." (*Id*. at 66-67.) Because Thornton "was with Andrew all night" (Pl. Br. at 6), the jury was able to infer from Bell's testimony that Andrew was also "running" in the "crowd" with Thornton.

Andrew's friend, Jordan Porrino, testified repeatedly that Andrew was running on the Midway towards officers in the process of detaining individuals. (Dkt. 458 at 125-26; 129-33.) Jordan testified that she was talking with Andrew when they observed Andrew's friends being escorted away by deputies, and that "Andrew started running after them." (*Id*. at 125-26.) Porrino reiterated multiple times that she saw Andrew "running" after his friends and the deputies. (*Id*. at 129-132.) When asked to clarify whether Andrew was "running" or in a "fast walk," Porrino responded twice: "*He was running*." (*Id*. at 133.)

Corporal Clark, who was assigned to "crowd control, patrolling the midway, and security at the Fair," recalled escorting and ejecting an individual by the name of Amir Abdullah at approximately 8:00 p.m., but had no memory of Andrew. (Dkt. 453 at 99.) However, because Andrew's Ejection Form lists Corporal Clark as the "Escort Deputy," Corporal Clark did not dispute that he escorted Andrew from the Midway to be processed for ejection. (Dkt. 439 at # 42A.) Andrew's Ejection Form, which was prepared by former co-Defendant Deputy Henry Echenique, who was

released from the case on summary judgment based on qualified immunity, listed the "offense" leading to Andrew's ejection as "Disorderly Conduct," and described the "Details" of the incident as "running through the Midway causing disorderly conduct." (Dkt. 439 at # 42A.) Corporal Clark explained it would have been consistent with his "standard operating procedure" to have told Deputy Echenique the reason for the ejection. (Dkt. 453 at 103.) Deputy Echenique, in turn, recalls Corporal Clark telling him to write "running through the Midway causing disorderly conduct" on the Ejection Form, which he confirmed is grounds for ejecting someone from the Fair. (Dkt. 453 at 170-172; 178; 180.)

Plaintiff's assertion that "neither Clark nor any other HCSO officer actually witnessed Andrew running, being disruptive or disorderly" is incorrect. (Pl. Br. at 8.) Andrew's Ejection Form is evidence that Andrew was seen "running" on a crowded Midway and therefore engaged in "disorderly conduct." Sergeant Bell and Jordan Porrino corroborated that Andrew was running on a crowded Midway in pursuit of law enforcement officers in the process of detaining other juveniles. Corporal Clark's inability to remember Andrew does not mean that neither he, nor any other law enforcement officer, "actually witnessed Andrew running."

While Plaintiff's unsuccessful Section 1983 claim was centered on Corporal Clark's detention of Andrew on the Midway, his wrongful death claim against the Sheriff focused on the Sheriff's vicarious liability for the alleged "operational"

negligence of Sheriff's deputies, "if any, in implementing the safety and security policies established for the Fair relating to their conduct towards [Andrew] after [he] was seized at the Fair." (Dkt. 436 at 12.) According to the unrefuted evidence at trial, however, Andrew was in good spirits in the processing area, was not scared, and was not harmed. (Dkt. 453 at 182-185.) Andrew also was not injured when he was driven a short distance from the processing area to the Gate 4 ejection site by Lieutenant Stephen Jones. (Dkt. 335 at 11.) Nor was he injured at the ejection site itself. Plaintiff's case therefore boiled down to one issue: whether the Sheriff had a statutory duty to contact Andrew's parents and release him into their custody under sections 985.101(3) and 985.115(2), and whether the Sheriff's deputies' failure to do so involved an issue of training and planning and was therefore "discretionary" rather than "operational" in nature.

The evidence at trial, however, refuted the applicability of the statutory parental notification and release requirements to the facts of the case. According to the testimony of the Sheriff's witnesses, an "ejection" is distinguishable from an arrest or detention under the statutes. Unlike an arrest, for example, juveniles ejected from the ticketed portion of the Fair were allowed to remain on Fair property and to keep their cell phones, and had the ability to call their parents or other responsible adult for a ride home. Andrew's friend, Jalen Harrison, testified that he and his friends "knew we had to call our parents" when they reached the ejection site, and

they did so. (Dkt. 457 at 38; 52.) Andrew's twelve-year old companion, Corey Thornton, thought, "I got to call my mom and tell my mom I got kicked out of the fair or something like that." (Dkt. 456 at 96.) Corey didn't call a parent, however, because he "was with Andrew" who said, "no we're not going to call, we're just going to get a ride home, everything is going to be fine." (Dkt. 456 at 149-150.) Andrew made four calls from the processing area, and more calls after his ejection to Gate 4, but for unknown reasons – and unlike his friends – he never called his parents or anyone else to ask for a ride.

Jalen Harrison's father, Alton Harrison, who was also Andrew's coach, arrived at Gate 4 about 30 minutes after he received the call from his son. (Dkt. 456 at 25.) His wife arrived at the Fair around the same time. (*Id.* at 29.) The mothers of Andrew's other friends also came to Gate 4 after receiving calls from their sons. (*Id.* at 32-33.) Although Coach Harrison twice offered Andrew a ride home, Andrew declined, explaining he was going to stay at Gate 4 and wait for his ride to pick him up. (*Id.* at 39.) When Coach Harrison's wife asked Andrew whether he was "sure" he didn't want a ride home, Andrew replied, "Yes, I'm sure." (*Id.* at 39.) Before leaving the ejection site, Coach Harrison told Andrew to let him know if his ride didn't show up, and said he would come back and pick him up. (*Id.* at 40.) Coach Harrison testified that Andrew "appeared to be safe" when he left him at Gate 4, and that he was not "concerned for Andrew's safety." (*Id.* at 40-41.)

Andrew, however, did not stay at Gate 4, call for a ride home, or ask Coach Harrison to take him to the Gate where his ride was picking him up. Instead, he chose to leave the boundaries of the Fair property altogether, and to walk down the Orient Road sidewalk and under I-4 towards the Hard Rock Casino. At trial, and over the defense's objection, Corey Thornton attempted to blame this unfortunate decision on the Sheriff's Office by reference to hearsay statements purportedly made by an *unidentified* "officer" dressed in green. According to Thornton, an unidentified individual declined the juveniles' requests for assistance in getting to the Gate where they had been dropped off, said they could be "arrested" if they stayed at Gate 4 or re-entered the ticketed portion of the Fair, and advised that the "only thing" separating them from the Gate they were seeking was the "highway." (Dkt. 456 at 48; 134.)

No evidence was ever presented, however, that the unidentified individual "dressed in green" was a Sheriff's deputy. In fact, when asked if he knew whether the so-called "officer" could have been "working for the Fair security company, Andy Frain," Thornton testified: "No, sir, I don't know if he was working with the security or not." (Dkt. 456 at 53.) When asked whether he was aware that guards working for the security company were also wearing green, Thornton testified: "Wasn't aware of that." (*Id.*) When asked if he knew whether the "officer" was "on-duty or off-duty," Thornton testified: "No, sir, I do not know." (*Id.*)

Plaintiff's assertion that Andrew and Corey "were left alone" to "fend for themselves" and were placed in a "dangerous situation" at the Gate 4 ejection site is contradicted by the evidence. (Pl. Br. at 10.) Witnesses testified at trial that the ejection site was safe, and that ejected juveniles were allowed to remain on Fair property and to call or accept a ride home. Andrew and Corey were not left with "no other option" but to "walk [ ] down the Orient Road sidewalk and under [I-4] to the Hard Rock Casino." (Pl. Br. at 10.) Rather, they had the "option" to stay on Fair property and to call and wait for a ride home – like all of their friends did. (Dkt. 454 at 41-42.)

Unfortunately, over two hours after his detention by Sheriff's deputies had ended and he was released at Gate 4, Andrew instead made the independent and unforeseeable decision to leave the safety of Fair property altogether, and to venture down the Orient Road sidewalk and under I-4 to the Hard Rock Casino. After reaching the Hard Rock Casino and then running across I-4 back towards the Fair, Andrew told Corey they needed to run back across I-4 to the casino after receiving a call on his cell. (Dkt. 456 at 170-72.) That choice had a tragic consequence. As Andrew attempted to run back across I-4 a second time, he was tragically struck and killed by a motorist. (Dkt. 456 at 137-38.)

After witnessing the accident, Thornton retraced his original path, safely crossing under I-4 and over the Orient Road sidewalk, to reunite with the friends he

had driven with to the Fair and their designated driver, Shawntae Munn. (Dkt. 457 at 173.) Although Ms. Munn had dropped the boys off at Gate 3, she picked them up at Gate 4, presumably because Andrew had told her son, Timothy Denson, in the numerous phone calls they exchanged after the ejection, that he and Corey had been ejected to Gate 4. (*Id.* ) Thornton did not tell Ms. Munn about the accident. (Dkt. 456 at 138.) After unsuccessfully searching for Andrew, Ms. Munn called Andrew's mother at 11:52 p.m. (Dkt. 457 at 183.)

Corporal Robert Hinton, a traffic homicide investigator with the Florida Highway Patrol, conducted a traffic homicide investigation into Andrew's death. (Dkt. 458 at 162; 166.) Corporal Hinton confirmed it is against the law for a pedestrian to cross a limited access highway like I-4, and concluded that Andrew was the cause of the accident. (Dkt. 458 at 169.)

## III.  Standard of Review.

### A.  Joseph's Appeal.

This Court reviews *do novo* the denial of a Rule 50 motion for judgment as a matter of law. *See, e.g., Gill as Next Friend of K.C.R v. Judd*, 941 F.3d 504, 526 (11th Cir. 2019). "A Rule 50 motion may be granted only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Id.*  (citation omitted). This Court reviews the grant or denial

of a motion for new trial for an abuse of discretion, giving "greater deference" to denials. *See, e.g., United States v. Moore*, 76 F.4th 1355, 1363 (11th Cir. 2023).

**B.  Sheriff's Cross-Appeal.**

**1.  Jury Instruction.**

This Court reviews *de novo* the legal correctness of a jury instruction. *United States v. Shah*, 981 F.3d 920, 925 (11th Cir. 2020) (quoting *United States v. Melgen*, 967 F.3d 1250, 1259 (11th Cir. 2020). A district court's interpretation and application of a statute is also reviewed *de novo. United States v. Grigsby*, 111 F.3d 806, 816 (11th Cir. 1997). In conducting a *de novo* review of a district court's jury instructions, this Court evaluates whether the instructions "misstate the law or mislead the jury to the prejudice of the objecting party." *Grigsby*, 111 F.3d at 814.

**2.  Sovereign Immunity.**

"Sovereign Immunity is a question of law that we review *do novo*." *Johnson v. Conner*, 720 F.3d 1311, 1313 (11th Cir. 2013).

**3.  Admission of Evidence.**

Rulings on the admissibility of evidence are reviewed for abuse of discretion. *See, e.g., City of Tuscaloosa v. Harcros Chemicals, Inc*., 158 F.3d 548, 556 (11th Cir. 1998) A "district court by definition abuses its discretion when it makes an error of law." *Id.* Therefore "when the district court misinterprets the Federal Rules of Evidence…our review is plenary." *Id.*

# SUMMARY OF ARGUMENT

## A.     Joseph's Appeal.

The District Court's Order denying Plaintiff's Motion for Judgment as a Matter of Law and Motion for New Trial should be affirmed because there was a "legally sufficient evidentiary basis" for the jury to find in favor of Corporal Clark on the Section 1983 claim. Plaintiff bore the burden of proving the absence of probable cause on the part of Corporal Clark in detaining Andrew on the Midway, and he failed to satisfy his burden. Substantial evidence was offered at trial that Andrew was running on a crowded Midway in pursuit of officers detaining other juveniles at the time he was detained, and therefore was engaged in disorderly conduct for purposes of section 616.185, Florida Statutes. And because the District Court correctly denied Plaintiff's Rule 50 motion after determining the evidence at trial was more than "legally sufficient" to support the jury's verdict, the Court also correctly denied Plaintiff's Rule 59 Motion for New Trial.

## B.     Sheriff's Cross-Appeal.

### 1.     Jury Instruction.

The verdict in favor of Plaintiff on his wrongful death claim against the Sheriff should be reversed based on the District Court's legal error in instructing the jury that the Sheriff violated a "duty" owed to Andrew under the parental notification and release statutes, and that the Sheriff's "violation" of the statutes was "evidence of

negligence." The actual language of the statutes, which the jury was never provided, unambiguously establishes that the parental notification and release requirements are triggered when a juvenile enters the juvenile justice system – not during an ejection. The instruction was erroneous for the additional reason that the statutes do not create a private cause of action in negligence for their breach. And finally, by allowing the Sheriff to present substantial testimony at trial refuting the applicability of the statutes to the facts of this case, and then undermining the credibility of that testimony and the Sheriff's entire case by instructing the jury that the Sheriff "violated" the statutes and that the violations were "evidence of negligence" – prompting Plaintiff's counsel to repeatedly call the Sheriff's witnesses "liars" in closing argument (Dkt. 487 at 66; 71) – the Court's instruction deprived the Sheriff of a fair trial.

### 2. Sovereign Immunity.

Even if the Sheriff owed Andrew a legal "duty" under the facts of the case, the Sheriff is nevertheless entitled to the entry of judgment in its favor based on the doctrine of sovereign immunity. Assuming Sheriff's deputies were "negligent" in failing to notify Andrew's parents of his ejection or to release him into their custody, their conduct would have involved a matter of "public safety" for which immunity has not been waived. Alternatively, any alleged "negligence" attributable to the Sheriff's deputies necessarily would have involved issues of planning or training and

therefore "discretionary" functions, or alternatively, was committed by an individual after Andrew's detention was over and who was not even identified as a Sheriff's deputy. And finally, no injury caused by any such "negligence" was ever established.

### 3. Admission of Evidence.

Finally, the District Court also erred when it allowed Corey Thornton to testify regarding hearsay statements purportedly made by an unidentified "officer" dressed in green  to the effect that Andrew could be "arrested" if he stayed at the Gate 4 ejection site or re-entered the ticketed portion of the Fair, and that the "only thing" separating him from the Gate he was seeking was the "interstate." The statements were offered for their "truth" and therefore are classic hearsay. The testimony was inherently unreliable, moreover, given that Thornton was unable to say whether the alleged declarant was a Sheriff's deputy or a security guard. Finally, any probative value of the evidence was far outweighed by its prejudicial effect, especially since the "evidence" was calculated to satisfy the element of proximate causation otherwise missing from Plaintiff's case in light of the two-hour gap between Andrew's ejection and his death on I-4. The admission of the testimony was therefore reversible error.

## ARGUMENT ON MAIN APPEAL

**THE DISTRICT COURT CORRECTLY DENIED PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL.**

Plaintiff had the burden of proving the absence of probable cause on the part of Corporal Clark in detaining Andrew on the Midway by a preponderance of the evidence. *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th. Cir. 1998) ("Plaintiffs have the burden of demonstrating the absence of probable cause in order to succeed in their § 1983 claim"); *see also Anderson v. Ferreira*, Case No. 6:19-cv-2014-JA-GKK, 2021 WL 3603049, at *3 (M.D. Fla. 2021) (same). After a nine-day trial – and in the face of substantial evidence that Andrew was running on a crowded Midway in pursuit of officers detaining other juveniles at the time he was detained – the jury determined Plaintiff failed to satisfy his burden. The District Court's Order denying Plaintiff's Motion for Judgment as a Matter of Law and Motion for New Trial therefore should be affirmed. *See, e.g., Gill*, 941 F.3d at 526 ("motion for judgment as a matter of law may not be granted unless the "evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict"); *see also Reid v. Neal*, 688 F. App'x 613, 617 (11th Cir. 2017) ("A verdict must stand unless no legally sufficient evidentiary basis exists for a jury to find for the prevailing party"); *Lozman v. City of Riviera Beach,* 681 F. App'x 746, 751 (11th Cir. 2017), *vacated on other grounds*, 138 S. Ct. 1945, 1955 (2018)

(affirming denial of motion for new trial because jury's finding that officer had probable cause for arrest was not against the great weight of the evidence).

**A.   The District Court Correctly Denied Plaintiff's Motion for Judgment as a Matter of Law Because the Evidence Was Legally Sufficient to Support the Jury's Verdict in Favor of Corporal Clark.**

A court should not grant judgment as a matter of law under Rule 50 where there is a legally sufficient evidentiary basis for a reasonable jury to find in favor of a party on a particular issue. Fed. R. Civ. P. 50(a). In considering a Rule 50 motion, the court must draw all reasonable inferences in favor of the non-moving party, cannot make credibility determinations, cannot weigh the evidence, and must disregard evidence the jury need not have believed. *Chmielewski v. City of St. Pete Beach,* 890 F.3d 942, 948 (11th Cir. 2018); *see also Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (court views the evidence in the light most favorable to the non-moving party on motion for judgment as a matter of law). A jury's verdict should be upheld if the evidence was "adequate to support the jury's conclusions even if contrary conclusions could be drawn." *Chaney v. City of Orlando*, 291 F. App'x 238, 241 (11th Cir. 2018); *see also Shannon*, 292 F.3d at 715 (court must not "second guess" or "substitute" its judgment for that of the jury if "reasonable jurors could reach different results").

"Probable cause does not require conclusive evidence" and "is not a high bar.'" *Washington v. Howard*, 25 F.4th 891, 899 (11th Cir. 2022). Rather, the

probable-cause standard simply asks "whether a reasonable officer could conclude…that there was a substantial chance" that an offense has been committed. *Id.* (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). Probable cause does not probe an individual officer's "subjective intent" or "state of mind" which is "irrelevant" to the probable cause analysis. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019). Probable cause may be found "even in the absence of the actual observance of criminal conduct when a prudent observer would reasonably infer that a defendant acted illegally." *United States v. Burton*, 288 F.3d 91, 98 (3rd Cir. 2002) (citing *Illinois v. Gates*, 462 U.S. 213, 243 n. 13 (1983)); *see also Glenn v. Lanier*, No. 3:09cv1/MCR/MD, 2010 WL 1380164, at *9 (M.D. Fla. 2010) ("Circumstantial evidence, inferences, and common-sensical interpretations of facts can lead to probable cause."); *Gates,* 462 U.S. at 245 n.13 ("innocent behavior frequently will provide the basis for showing of probable cause").

The District Court correctly determined that the "jury's finding that Plaintiff failed to prove the absence of probable cause is supported by the [following] evidence adduced at trial," including "circumstantial evidence…presented at trial by both parties" that "Corporal Clark had probable cause [to] seize Andrew on the Midway for a suspected violation of Fla. Stat. § 616.185." (Dkt. 461 at 8-9):

## 1. Ejection Form.

The jury's verdict is supported by Andrew's Ejection Form, which "was introduced by Plaintiff at trial, without limitation, and was relied upon heavily by Plaintiff in his case in chief." (Dkt. 461 at 9.) The Ejection Form memorialized the reason for Andrew's ejection from the Fair: "Running on the midway causing disorderly conduct." (Dkt. 439 Ex.42-A.) The form provided a legally sufficient evidentiary basis for Corporal Clark's detention of Andrew on the Midway. *See, e.g., Newton v. Ryder Transp. Services, Inc.*, 206 F.3d 772, 775-76 (8th Cir. 2000) (reversible error to exclude report prepared by officer who could not remember facts regarding accident); *America v. Mills*, 654 F. Supp. 2d 28, 35 (D.D.C. 2009) (where "witness cannot remember facts about the case…but at one time had knowledge of the facts reflected in a memorandum or other record made or adopted by the witness when the matter was fresh in the witness's memory, the memorandum or record may be introduced into evidence.") (emphasis added); *People v. Strausberger*, 503 N.E.2d 832, 834-35 (Ill. App. 2d 1987) (police report admissible for the purpose of establishing probable cause where officer had no independent recollection of circumstances of arrest).

Corporal Clark testified at trial that he told Deputy Echenique what to write on the Ejection Form, and confirmed he would have told Deputy Echenique what he knew at the time, which he said would have been his "standard operating procedure."

(Dkt. 453 at 103; 129.) Deputy Echenique corroborated Corporal Clark's testimony, confirming that Clark told him what to write on the form. (Dkt. 453 at 170; 171-179.) Plaintiff presented no evidence that Corporal Clark had any motive or reason to lie about the information memorialized on the form. *See, e.g., Fox v. Graff*, 276 F. App'x 936, 938 (11th Cir. 2008) (affirming probable cause determination where arrestee presented "no evidence of any motive for [Sheriff] to falsify evidence").

The District Court correctly determined that the Ejection Form was legally sufficient evidence that Corporal Clark did not lack probable cause to detain Andrew for running on the Midway causing disorderly conduct. The Court correctly rejected Plaintiff's argument that Corporal Clark's "subsequent lack of memory of the event" somehow "conclusively prove[d] that he did not see this behavior occur." (Dkt. 461 at 9.) Citing to Supreme Court authority, the Court noted that "an individual officer's subjective intent or state of mind is *irrelevant* to the probable cause analysis." (Dkt. 461 at 7, citing *Nieves*, 139 S. Ct. at 1725).

Plaintiff's contention that the Ejection Form was not competent evidence of probable cause because the "sole witness who testified regarding Andrew's conduct said he was 'walking'" is contradicted by the evidence. (Pl. Br. at 16.) Jordan Porrino repeatedly testified that Andrew was *running* on the Midway with a group of friends towards officers in the process of detaining other juveniles, which the overwhelming evidence at trial established was disruptive to the orderly conduct of the Fair and

therefore grounds for ejection. (Dkt. 458 at 125-126; 129; 132-36.) The fact that Corporal Clark does not remember Andrew does not mean that "no one saw" Andrew running on the Midway. Probable cause, moreover, may be found even where the detaining officer does not specifically remember the circumstances of the detention. *United States v. Clark*, 32 F.4th 1080, 1087 (11th Cir. 2022) (probable cause standard does not require officers to have a perfect memory as to why they stopped an individual).

Plaintiff's assertion that the "evidence at trial showed that merely running would not have amounted to 'disorderly conduct'" misstates the evidence. (Pl. Br. at 16.) Andrew was not detained for "merely" running. He was detained for running on a crowded Midway in pursuit of deputies in the process of detaining other juveniles, and therefore for engaging in "disorderly conduct" as defined under section 616.185, Florida Statutes.

Plaintiff's reliance on inapposite case law "made in the warrant application process" and pertaining to an officer's authority to make a "warrantless arrest for a misdemeanor" is plainly misplaced because this case does not involve a "warrant application" or a "warrantless arrest for a misdemeanor." (Pl. Br. at 16-18.) Plaintiffs reliance on testimony that a "law enforcement officer would have to witness a violation of law in order to affect a detainment of some sort" is also misplaced, given

Plaintiff's failure to satisfy his burden of proving that Corporal Clark did not witness a violation of the law. (Pl. Br. at 18.)

## 2. Trial Testimony.

The jury's verdict is also supported by the testimony of multiple witnesses who "corroborat[ed] that the conduct described in the ejection form was more likely than not what Clark witnessed on the Midway." (Dkt. 461 at 9.) Multiple witnesses testified regarding the large crowds and chaos on the Midway the evening of February 7, 2014. (Dkt. 453 at 138 (Clark); Dkt. 458 at 36 (Bell); Dkt. 458 at 118 (Porrino); Dkt. 457 at 47 (Harrison); Dkt. 456 at 180 (Pearson)). (Dkt. 450: Def. Ex. 15.) Multiple witnesses also testified that running on the Midway on the evening of Student Day 2014 was disruptive to the orderly conduct of the Fair because of the size of the crowds and the chaos that night. Plaintiff's assertion that "running on the Midway at the Fair without more did not violate any law or fair rule" misstates the evidence because Andrew was detained for "more" than just "running." (Pl. Br. at 21.)

Plaintiff's contention that he satisfied his burden of proving the absence of probable cause because no one "saw Andrew running on the midway, being disorderly, or disrupting the orderly conduct of the fair, or provided any factual basis…for Echenique's conclusory assertion on the ejection form," is contradicted by the evidence. (Pl. Br. at 18.) Deputy Echenique and Corporal Clark verified the

accuracy of the information on the Ejection Form. Jordan Porrino testified repeatedly that Andrew was "running" on a crowded Midway in pursuit of officers detaining other juveniles. Sergeant Bell testified that Corey (and presumably his companion Andrew) were running with a group through a crowded Midway, disrupting the orderly conduct of the Fair and the officers in the performance of their duties, at the time they were detained.

The District Court correctly concluded that the "jury was free to believe the version of events recounted by Porrino," and that "probable cause could have been found" even if "Andrew was innocently running to pick up a hat or running towards law enforcement to ensure his friends' safety." (Dkt. 461 at 11, citing *Gates*, 462 U.S. at 245 n. 13, for the proposition that "innocent behavior frequently will provide the basis for a showing of probable cause"). The District Court further noted, correctly, that the "jury was also free to accept Bell's version of events." (*Id.*) Finally, the District Court correctly acknowledged that, in ruling on a Rule 50 motion, the Court "cannot make credibility determinations or reweigh the evidence." (*Id.*, citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 135 (2000)).

Plaintiff's assertion that "*Clark* must have seen Andrew running on the midway *and* causing a disturbance at the time of his detention" for Clark to have had "probable cause to seize Andrew" ignores his burden of proof. (Pl. Br. at 19.) Plaintiff bore the burden of proving the *absence* of probable cause on the part of

Corporal Clark in detaining Andrew on the Midway, and he failed to satisfy his burden. As the District Court correctly determined, circumstantial evidence presented at trial by both parties "could have supported the jury's finding by a preponderance of the evidence that Clark had probable cause [to] seize Andrew on the Midway" for a violation of Section 616.185, "despite Clark's lapse in memory." (Dkt. 461 at 8-9.)

Plaintiff's contention that Porrino's testimony is not evidence that Andrew was causing a disturbance because she purportedly "did not see Andrew running near any deputies" or anything "that might have drawn the deputies' attention" misstates the evidence. (Pl. Br. at 19.) Porrino repeatedly testified that Andrew was "running" as "Jalen and Hassan were getting taken away by the deputies." (Dkt. 458 at 125-126; 129-32.) Whether or not Porrino saw any "interaction between Andrew and Clark" is irrelevant. (Pl. Br. at 19.)

Plaintiff's criticism of the District Court for relying on Sergeant Bell's testimony that Corey Thornton was detained for running on the Midway, because "no one saw Andrew doing anything that justified his detention," is misguided. (Pl. Br. at 20.) The District Court correctly determined that Sergeant Bell's testimony about Thornton running on the Midway provided circumstantial evidence from which a jury reasonably could have concluded that Andrew – who was on the

Midway with Thornton – was also running with Thornton in a crowd in pursuit of deputies in the process of detaining other juveniles. (Dkt. 461 at 10-11.)

Plaintiff's reliance on this Court's comment in *Joseph v. Chronister*, No. 20-11073, 2021 WL 4739608 (11th Cir. 2021) (on appeal of a summary judgment ruling) that the "law was clearly established in February of 2014 that mere proximity to one who is suspected of (or has committed) an offense does not provide probable cause or arguable probable cause for a detention" is misplaced. (Pl. Br. at 22.) As the District Court correctly acknowledged, this Court's opinion in *Joseph* was entered in the context of a summary judgment order – not a jury verdict or a final judgment. (Dkt. 457 at 199-200.) The opinion therefore is not the law of the case. *See, e.g., Oliver v. Orange Cnty., Fla.,* 456 F. App'x 815, 818 (11th Cir. 2012) ("Law of the case applies only where there has been a final judgment"). And in any event, the evidence at trial established that Andrew was not detained because he was in "mere proximity" to others, but because he was running on a crowded Midway in pursuit of officers in the process of detaining other juveniles.

Plaintiff's further reliance on this Court's statement in *Joseph* that, "for summary judgment purposes Andrew was not, in any conceivable way, committing a crime, or even breaking any rule," is equally misguided. (Pl. Br. at 25.) Once again, an appellate decision entered in the context of a summary judgment order is not dispositive in the context of an appeal from a final judgment following a jury verdict.

*See, e.g., Oliver*, 456 F. App'x at 818. (Dkt. 457 at 199-200.) The "evidence presented at trial," moreover, provided a legally sufficient basis to support the jury's finding that Andrew was running on the Midway with a group of juveniles in pursuit of officers in the process of detaining other individuals, which is an offense under section 616.185.

In short, the District Court correctly determined that the evidence at trial was more than "legally sufficient" to support the jury's verdict in favor of Corporal Clark. Plaintiff bore the burden at trial of proving the absence of probable cause on the part of Corporal Clark in detaining Andrew on the Midway, and he failed to satisfy his burden. The District Court's Order should be affirmed.

**B.**    **The District Court Correctly Denied Plaintiff's Motion For New Trial On Issues Remaining As To His Section 1983 Claim Against Corporal Clark.**

Because Plaintiff's Rule 50 motion was correctly denied, the District Court did not abuse its discretion in denying Plaintiff's Rule 59 Motion for New Trial. Therefore, the District Court's Order denying Plaintiff's Motion for New Trial also should be affirmed.

## ARGUMENT ON CROSS-APPEAL

**I.** **THE DISTRICT COURT ERRED AS A MATTER OF LAW WHEN IT INSTRUCTED THE JURY THAT THE PARENTAL NOTIFICATION AND RELEASE REQUIREMENTS OF CERTAIN UNIDENTIFIED STATUTES CREATED A LEGAL "DUTY" IN NEGLIGENCE ON THE PART OF THE SHERIFF AND THAT THE SHERIFF'S "VIOLATION" OF THE STATUTES WAS "EVIDENCE OF NEGLIGENCE."**

The District Court's instruction to the jury that the section 985.101(3) and 985.115(2) parental notification and release statutes (which the Court failed to identify or quote) created a legal "duty" for purposes of a private cause of action in negligence against the Sheriff, that the Sheriff "violated" the statutes, and that the jury could consider the "violations" as "evidence" of negligence, was reversible error for multiple reasons. (Dkt. 436 at 14.) To begin with, the District Court erred in failing to identify and to provide the jury with the language of the statutes. *See, e.g., Grigsby*, 111 F.3d at 821 (district court erred in instructing jury regarding statute without providing jury with the "statutory wording" and instead including language "not in the statute"). In addition, the Court misinterpreted the unidentified statutes as creating a legal "duty" in negligence on the part of the Sheriff where no intent on the part of the Florida Legislature to create such a duty for purposes of a private right of action in negligence exists. *See, e.g., Freehauf v. School Bd. of Seminole Cnty.*, 623 So. 2d 761, 762 (Fla. 5th DCA 1993) (affirming trial court's determination that statute did not create a legal duty in favor of injured minor on the

part of the School Board). The Court's instruction not only misstated the law, but misled the jury to the prejudice of the Sheriff by essentially inviting the jury to enter a verdict in Plaintiff's favor after telling the jury that the Sheriff "violated" the statutes. And finally, the instruction deprived the Sheriff of a fair trial by undermining the credibility of multiple defense witnesses who refuted the applicability of the statutes to the facts of the case, prompting Plaintiff's counsel to repeatedly refer to the defense witnesses as "liars" in closing argument. (Dkt. 486 at 66:71) The jury was not "properly guided in its deliberations," to the Sheriff's substantial prejudice. *Grigsby*, 111 F.3d at 814. The District Court's "statutory violation" instruction, therefore, was reversible error both as a matter of substantive law, and in the context of the trial.

> **A. The District Court's Instruction was Legal Error Because the Parental Notification and Release Statutes Are Not Applicable Under the Facts of this Case and Do Not Create a Private Right of Action.**

The section 985.101(3) and 985.115(2) parental notification and release statutes are found in Part III of Chapter 985, Florida Statutes, titled "Custody and Intake; Intervention and Diversion," and are part of the State's "Criminal Procedure and Correction" legislation within the context of the "Juvenile Justice" delinquency system.

Chapter 985.101(3) provides:

> When a child is taken into custody *as provided in this section*, the person taking the child into custody shall attempt to notify the parent, guardian, or legal custodian of the child. The person taking the child into custody shall continue such attempt until the parent, guardian, or legal custodian of the child is notified *or* the child is delivered to the department under ss. 985.14 and 985.145, whichever occurs first.

*See* § 985.101(3), Fla. Stat. (emphasis added).

Section 985.14 (referenced in § 985.101(3)) addressees the "intake and case management" process when a juvenile enters the juvenile justice system – which did not occur in this case. Section 985.145 (also referenced in the statute) establishes the "responsibilities" of the Department of Juvenile Justice "during intake" as well as "screening and assessments" – also irrelevant to this case. Under the plain language of section 985.101(3), therefore – and as the defense witnesses all testified – the parental notification requirement of section 985.101(3) is triggered when a juvenile *enters the juvenile justice system* – not during an ejection.

By failing to quote the *actual* statutory language, the District Court deprived the jury of critical contextual information clarifying that the section 985.101(3) parental notification requirement applies "[w]hen a child is taken into custody *as provided in this section*" – not simply when a child is "taken into custody" as instructed by the Court. Section 985.101(1)(a)-(d) lists the four circumstances where parental notification is required after a juvenile has been taken into "custody" as "provided" in that section:

(a) Pursuant to an order of the circuit court issued under this chapter, based upon sworn testimony, either before or after a petition is filed.

(b) For a delinquent act or violation of law, pursuant to Florida law pertaining to a lawful arrest…

(c) By a law enforcement officer for failing to appear at a court hearing after being properly noticed…

(d) By a law enforcement officer who has probable cause to believe that the child is in violation of the conditions of the child's probation, supervised released detention, post commitment probation, or conditional release supervision; has absconded from non-residential commitment; or has escaped from residential commitment.

*See* § 985.101(1)(a) – (d), Fla. Stat.

According to the plain language of the statute – and as the defense witnesses testified – the *four instances* where parental notification is required under the statute *after a juvenile has been taken into the custody of the juvenile justice system* have no relevance to this case. Unlike a juvenile who has been arrested, taken into the custody of the juvenile justice system, and transported to a juvenile assessment center, Andrew was never arrested or charged with a crime. Rather, he was ejected to an adjacent Fair property, and was allowed to retain possession of his personal belongings, including his cell phone. Unlike a juvenile who has no way of contacting his parents or other responsible adult once in "custody" as "provided in" section 985.101(1)(a)-(d), Andrew was free to use his cell phone to call his parents or other responsible adult for a ride home – like all of his friends did. The actual statutory

language – which the District Court omitted from the instruction – is consistent with the testimony of the Sheriff's witnesses, who uniformly testified that the parental notification requirement of section 985.101(3) has no applicability under the circumstances of this case.

The parental release requirement of section 985.115(2), which is also part of Chapter 985 addressing "custody and intake" provisions when a juvenile enters the juvenile justice system, is inapplicable for the same reason. According to the statute, which the jury never saw:

> (2)  Unless otherwise ordered by the court under § 985.255 or § 985.26, and unless there is a need to hold a child, a person taking a child into custody shall attempt to release the child as follows:
>
> (a) To the child's parent, guardian, or legal custodian or, if the child's parent, guardian, or legal custodian is unavailable, unwilling, or unable to provide supervision for the child, to any responsible adult…

*See* § 985.115(2)(a).

Sections 985.255 and 985.26 (referenced in the statute) address the placement of a juvenile (who has been "taken into custody" for purposes of Chapter 985) "into detention care," as well as the "length of detention." Like the parental notification requirement of section 985.101, therefore, section 985.115 addresses the release of a juvenile to his or her parent, guardian, or legal custodian, when that juvenile has

been "taken into [the] custody" of the juvenile justice system – which did not occur in this case.

This Court "must examine the statutory language" at issue in determining whether the "district judge properly instructed the jury as to its application, given the facts in [the] case." *Grigsby*, 111 F.3d at 816. This Court is "troubled" when the district court does not include the "statutory wording" in the instruction, or provides the jury with "incomplete instructions." *Id.* at 821, 834. That is precisely what occurred in this case. The District Court did not provide the jury with the "statutory wording," but rather, gave an "incomplete" instruction regarding the Chapter 985 parental notification and release requirements. The Court further erred by instructing the jury, based on an erroneous interpretation of the statutes, that the Sheriff's Office owed Andrew a legal "duty" under the statutes, "violated" that "duty," and then invited the jury to consider that "violation" as "evidence of negligence." (Dkt. 436 at 14.)

In determining the applicability of a statute, federal courts are "guided by the Florida Supreme Court's directives." *Fuller v. Mort. Elect. Regis. Systems, Inc.*, 888 F. Supp. 2d 1257, 1270 (M.D. Fla. 2012). "To discern legislative intent," the court "looks 'primarily' to the actual language used in the statute." *Id.* (citing *Borden v. East-European Ins. Co.,* 921 So. 2d 587, 595 (Fla. 2006)). "Common law claims may not be premised on a violation of a statute where the statute is devoid of a private

right of action." *Id.* at 1271; *see also Freehauf*, 623 So. 2d at 763. "As a fundamental rule of statutory interpretation, 'courts should avoid readings that would render part of a statute meaningless.'" *Unruh v. State*, 669 So. 2d 242, 245 (Fla. 1996) (citing *Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 456 (Fla. 1992)). "Furthermore, whenever possible 'courts must give full effect to *all* statutory provisions and construe related statutory provisions in harmony with one another.'" *Id.*

The District Court's interpretation of sections 985.101(3) and 985.115(2) as creating a legal "duty" in negligence on the part of the Sheriff's Office to notify Andrew's parents of his ejection and to release him into their custody under the circumstances of this case violates settled principles of statutory construction. The Court instructed the jury that Andrew was "taken into custody" *for purposes of the statutes* when he was detained at the Fair, and from that erroneous conclusion, extrapolated that the Sheriff's Office owed Andrew a legal "duty" to notify his parents and release him to their care. That interpretation, however, is contradicted by the *actual language* of the statutes. Section 985.101(3) plainly states that parental notification is required "[w]hen a child is taken into custody *as provided in this section*," *i.e.,* under the "circumstances" of <u>section</u> 985.101(1)(a) – (d). Andrew was not "taken into custody" as "provided" in section 985.101(1)(a)-(d). Both statutes,

moreover, apply when a juvenile is taken into the "custody" of the juvenile justice system, which did not occur in this case.

By ignoring the language of section 985.101(3) specifying that parental notification is required "[w]hen a child is taken into custody *as provided in this section*," the District Court rendered the words "as provided in this section" meaningless. Section 985.101(3) does not state that parental notification is required *whenever* a child is "taken into custody," *e.g.*, when a juvenile is temporarily detained. Rather, the statute unambiguously states that parental notification is required when a child is "taken into custody *as provided in this section*," meaning, as "provided in" section 985.101(1)(a)-(d). Andrew was not "taken into custody as provided in" section 985.101(1)(a)-(d).

The plain language of sections 985.101(3) and 985.115(2), moreover, reveals no intent on the part of the Florida Legislature to create a "private cause of action for [their] breach," with the result that the Court erred in instructing the jury "that [the breach ] is…evidence of negligence." *Freehauf*, 623 So. 2d at 763. "Whether a statute creates a private cause of action for its breach, so that it is appropriate to instruct a jury that its breach is…evidence of negligence, turns on various considerations aimed at resolving what the Legislature intended when it passed the statute in the first place." *Freehauf*, 623 So. 2d at 763. Those "considerations," which are summarized by the Restatement (Second) of Torts § 286, include an intent

to "protect the particular interest which is invaded" and the "kind of harm which has resulted." *Id.* For example, although "[c]hildren injured while in the custody or under the supervision of a school authority may have common law causes of action for failure to supervise or protect them," "no private cause of action exists" under section 415.504 for failing to make a "[m]andatory report [ ] of child abuse or neglect." *Id.* at 763-64. By analogy, while a child injured while in the custody of law enforcement may have a common law cause of action in negligence, no "private right of action exists" arising out of a failure to notify and release to a parent under sections 985.101(3) and 985.115(2).

The District Court's instruction was therefore error for the additional reason that the plain language of the statutes reveals no intent on the part of the Florida Legislature to provide a "private cause of action" for breach of the parental notification and release requirements such "that it is appropriate to instruct a jury that [their] breach is…evidence of negligence," as occurred in this case. *See Freehauf*, 623 So. 2d at 763; *see also Manfre v. Shinkle*, 184 So. 3d 641, 647 (Fla. 5th DCA 2016) ("Legislature knows how to impose tort liability for breach of a duty of care" and finding no such intent in the statute); *Alderman v. Lamar*, 493 So. 2d 495, 497-98 (Fla. 5th DCA 1986) (affirming summary judgment in favor of sheriff on wrongful death claim where statute revealed no intent to provide individual

citizens with a statutory…right of recovery for a law enforcement officer's negligent enforcement of laws").

Nor are the Restatement "considerations" applicable in this case, where the statutes reveal no intent on the part of the Legislature "to protect the particular interests…invaded" or "the kind of harm which has resulted." *Freehauf*, 623 So. 2d at 763; *see also Chevron U.S.A., Inc. v. Forbes*, 783 So. 2d 1215, 1220 (Fla. 4th DCA 2001) (plaintiff in a negligence action not entitled to a jury instruction regarding a statutory violation unless he demonstrates that "violation of the statute was the proximate cause of his injury"); *Roberts v. Shop & Go, Inc.*, 502 So. 2d 915, 917 (Fla. 2d DCA 1986) ("Statutory violation must also be the proximate cause of the injury" and "foreseeability" of an "intervening causation" may be determined "as a matter of law" where the "intervening act is merely 'possible' rather than 'probable.'").

Here, the alleged statutory "violation" – failure to notify and release –was not the proximate cause of Andrew's injury. The proximate cause of Andrew's injury was his decision <u>not</u> to call his parents, to decline multiple offers of a ride home, and to instead leave the safety of Fair property altogether to venture over to the Hard Rock Casino and across I-4, twice. Because the statutes reveal no intent to protect "against the kind of harm which has resulted," the District Court's instruction that

the Sheriff's purported "violation" of the statutes may be considered "evidence of negligence" was legal error. *Freehauf*, 623 So. 2d at 763.

Indeed, no court in Florida has ever construed the parental notification and release requirements of sections 985.101(3) and 985.115(2) to create a legal "duty" on the part of law enforcement in a negligence action. Instead, cases addressing the parental notification statute (as well as its prior versions) clarify that the notification requirement applies within the context of an *interrogation* after a juvenile has been taken into the custody of the juvenile justice system – not a negligence cause of action. *See, e.g., Neely v. State*, 126 So. 3d 342, 346 (Fla. 3d DCA 2013) (although "section 985.101(3)…requires police to attempt to notify a juvenile's parents…upon taking a juvenile into custody" the "failure to comply with the statutory requirement does not render a confession involuntary."); *J.G. v. State*, 883 So. 2d 915, 924 (Fla. 1st DCA 2004) (acknowledging "[t]here is no constitutional requirement that police notify a juvenile's parents prior to questioning the juvenile" [under prior version of § 985.101(3)] and clarifying that parental notification is a "factor deemed relevant to the voluntariness of the waiver of rights"); *see also Doerr v. State*, 383 So. 2d 905, 907 (Fla. 1980) (acknowledging [under prior version of statute] that "[n]otification of the child's parents or legal custodians is required only after it is determined that the child will be detained or placed in shelter care" and that the statute "does not prohibit interrogation after the child is taken into custody but before

a determination is made to release or detain.") No court in Florida has ever held that the statutes create a "duty" for purposes of a private right of action in negligence under the facts of this case.

Finally, the "statutory violation" instruction was not only legally erroneous for the reasons stated, but also deprived the Sheriff of a fair trial. Specifically, the District Court permitted defense witnesses to testify extensively at trial regarding the inapplicability of the statutory parental notification and release provisions to the facts of the case, and even questioned those witnesses regarding the meaning of the statutes in the presence of the jury. The Court then undermined the credibility of those witnesses and the Sheriff's case by instructing the jury that the statutes were not only applicable to the case, but were "violated" by the Sheriff; and that the "violation" was "evidence of negligence." *See, e.g., Grigsby*, 111 F.3d at 814 ("The Court reviews jury instructions *do novo* to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party"). Defense counsel was compelled to move for a mistrial as a result, stating that the Court's admission of the evidence, followed by the instruction, was going to "undermine the credibility of the defense witnesses" and "call into question the credibility of the entire case." (Dkt. 459 at 124-126.) The District Court summarily denied the motion for mistrial without comment. (Dkt. 459 at 127.)

The prejudice to the Sheriff resulting from the admission of the testimony regarding the inapplicability of the statutes, followed by an instruction that the statutes created a legal duty on the part of the Sheriff and were "violated," was exacerbated by the improper comments of Plaintiff's counsel in closing argument. The District Court's instruction allowed counsel to argue to the jury:

> [T]hey all stood up and lied to you. They lied to your face. Every one of them stood up there and lied to you in the face of that clear statute.

(Dkt. 487 at 66.) Counsel continued: "You've heard no testimony from the Sheriff other than we get to do what we want, we have absolute discretion, and I'm going to lie to you about what the law is, just justifying their actions." (*Id.* at 71.) The instruction was therefore reversible error for the additional reason that it operated to deprive the Sheriff's Office of a fair trial by undermining the credibility of its defense. *See, e.g., United States v. Mayweather*, 991 F.3d 1163, 1186 (11th Cir. 2021) (reversing conviction where district court's instruction deprived defendants of a fair trial).

### B. The Court Should Certify a Question Regarding the Applicability of the Statutes to the Florida Supreme Court.

The Sheriff's Office submits that the plain language of sections 985.101(3) and 985.115(2) and case law construing those statutes establish the District Court's error in its instruction to the jury, and confirm that the jury was not properly guided in its deliberations. *Grigsby*, 111 F.3d at 814. However, in the event this Court were

to conclude that doubt exists regarding the applicability of the statutes to the circumstances of this case, then the Sheriff's Office respectfully submits that the Court should certify the question to the Florida Supreme Court. *See, e.g., Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 780 F.3d 1327, 1336 (11th Cir. 2015) ("when substantial doubt exists about the answer to a material state law question" it is "appropriate to certify the particular question to the state Supreme Court in order to avoid making unnecessary state law guesses and to offer the state court the opportunity to explicate state law"); *Jackson-Shaw Co. v. Jacksonville Aviation Auth.*, 508 F.3d 653, 654 n.2 (11th Cir. 2007) ("substantial doubt about a question of state law upon which a particular case turns should be resolved by certifying the question to the state Supreme Court"); *In re NRP Lease Holdings, LLC*, 20 F.4th 746, 750 (11th Cir. 2021) ("Principles of comity and federalism instruct us that because the only authoritative voice on Florida law is the Florida Supreme Court, it is axiomatic that that court is the best one to decide issues of Florida law").

Certification is requested not only because guidance by the Florida Supreme Court on the applicability of the parental notification and release statutes to the circumstances of this case is warranted, but also based on the public policy implications of the District Court's ruling. As the defense witnesses and defense expert all testified, the parental notification and release requirements of sections 985.101(3) and 985.115(2) – according to their plain language – are not applied

outside the context of an arrest, or a juvenile detention or transport to a juvenile assessment center. Plaintiff's expert, in contrast, testified that parental notification and release would be required in the case of an ejection – including under the hypothetical of a 17-year-old college student's ejection for disorderly conduct from a university football stadium. (Dkt. 455 at 180-82.)

Under the District Court's interpretation of the statutes, *any time* a juvenile is "taken into custody" by law enforcement – even temporarily, and even where the juvenile is not charged with an offense or taken into the custody of the juvenile justice system – parental notification and release are required. Moreover, if notification and release are not provided, law enforcement is subject to *civil liability in negligence* for anything that might happen to the juvenile after the detention has ended – no matter how unforeseeable or distant in time from the temporary detention. The implications of the District Court's ruling impact law enforcement officers across the State of Florida, and therefore warrant Florida Supreme Court review.

The Sheriff's Office therefore respectfully suggests certification of the following question to the Florida Supreme Court, in the event the Court finds ambiguity in the meaning of the statutes:

WHETHER THE PARENTAL NOTIFICATION AND RELEASE REQUIREMENTS OF SECTIONS 985.101(3) AND 985.115(2) CREATE A LEGAL DUTY ON THE PART OF LAW ENFORCEMENT FOR PURPOSES OF CIVIL LIABILITY IN A NEGLIGENCE ACTION WHERE A JUVENILE IS NOT ARRESTED OR TAKEN INTO THE CUSTODY OF THE JUVENILE JUSTICE SYSTEM AS PROVIDED IN SECTION 985.101(1)(a)-(d) OR TRANSPORTED TO A JUVENILE ASSESSMENT CENTER?

## II.     THE SHERIFF IS ENTITLED TO SOVEREIGN IMMUNITY.

If no legal duty is owed, then the issue of sovereign immunity is not applicable. *See, e.g., Pollock v. Fla. Dep't of Hwy. Patrol*, 882 So. 2d 928, 932 (Fla. 2004). However, even if the Sheriff's Office did owe Andrew a statutory or common law duty of care under the circumstances of this case, the Sheriff's Office is nevertheless entitled to sovereign immunity. *See, e.g., Wallace v. Dean*, 3 So. 3d 1035, 1044 (Fla. 2009) (citing *Pollock*, 882 So. 2d  at 932-23) (even where it is determined that a duty of care is owed, the court must then determine whether sovereign immunity bars an action for an alleged breach of that duty.)

Section 768.28, Florida Statutes, "waives governmental immunity from tort liability 'under circumstances in which the state…, if a private person, would be liable to the claimant, in accordance with the general laws of this state.'" *Dep't of Health and Rehabilitative Servs. v. B.J.M*, 656 So. 2d 906, 911 (Fla. 1995). However, an "exception" to the "waiver of immunity" applies for certain "discretionary" or "policy-making [and] planning" functions. *Id.* Included among

the "governmental function[s]" to which sovereign immunity applies is the "protection of public safety" because "there has never been a common law duty of care with respect to…legislative, executive, and police power functions." *Id.* at 912 (citation omitted).

"Discretionary" decisions that involve "policy making or planning" are therefore immune, while "[o]perational" decisions are not." *Wallace*, 3 So. 3d at 1035; *see also Trianon Park Condo. Ass'n v. City of Hialeah*, 468 So. 2d 912, 924 (Fla. 1985). An "operational" function is one that is "not necessary to or inherent in policy or planning" but "merely reflects a secondary decision as to how those policies or plans will be implemented." *See B.J.M.,* 656 So. 2d at 911. The courts employ a "case-by-case analysis" in distinguishing between "planning" and "operational" levels of decision-making by governmental agencies. *B.J.M*, 656 So. 2d at 911.

The District Court determined for purposes of summary judgment that the Sheriff's Office was "protected under the doctrine of sovereign immunity for [its] discretionary decisions regarding security and planning for the Fair," including "selecting the location of the Processing Area and Ejection Location." *See Joseph v. Chronister*, 8:16-cv-274-T-35CPT, 2020 WL 13657218, at *10 (M.D. Fla. 2020). The District Court further determined that the "deputies' decision to eject Andrew from the Fair [was] also a discretionary decision, for which sovereign immunity

applies." *Id.* The District Court otherwise noted that the Sheriff's Office was not "immune from being vicariously liable for the negligence of [its] employees" involving the "implementation" of the "policies" themselves. *Id.*

More specifically, the District Court determined for purposes of summary judgment that (i) the failure to attempt to contact Andrew's parent or guardian under section 985.101(3), (ii) Deputy Jones' transport of Andrew to a location outside the Fair gates and release of Andrew from police custody without following the directives of section 985.115(2) "at a point distant from [the] pick up location…with no direction, supervision, or oversight," and (iii) an "unknown HCSO employee['s]" denial of Andrew's request to re-enter the Fair and instruction that Andrew was "trespassing by remaining" at the Gate 4 ejection site and threat of arrest, were "operational" in nature and "not subject to sovereign immunity." *Id.*

However, witnesses testified at trial that, *if* parental notification and release were required under the statutes, policies for contacting parents of juveniles ejected from the Fair and releasing juveniles into their custody would have involved a matter of "training," and were therefore "planning" or "discretionary" functions to which sovereign immunity would apply. (Dkt. 455 at 135; Dkt. 459 at 60-61.) Lieutenant Jones, moreover, was acting in accordance with Fair policy when he released the juveniles at the ejection site, and Andrew in any event was not injured either during the transport or at the ejection site. Finally, hearsay statements attributable to an

"unknown" individual dressed in green at Gate 4, who purportedly told Andrew he could be arrested if he stayed at the ejection site, declined his request for assistance, and told him the "only thing" separating him from the Gate he was seeking was the interstate, was not evidence of "operational" negligence on the part of a Sheriff's deputy. Specifically, the "unknown" individual was never identified as a Sheriff's deputy, and his purported statements in any event were made after the detention ended.

Finally, even if the alleged conduct of the Sheriff's deputies challenged by Plaintiff were "operational" in nature, Plaintiff's negligence claim would still fail as a matter of law because he presented no evidence of any "injury" to Andrew arising out of that conduct. *See, e.g., Schwartz v. Wal-Mart Stores, Inc.*, 155 So. 3d 471, 473 (Fla. 5th DCA 2015) ("To prevail on her negligence claim, [plaintiff] had to prove four elements: duty of care, breach of that duty, causation, and damages.") "Causation is an essential element of negligence, and a plaintiff is entitled to recover only for injury, loss, or damage caused by a defendant's negligence. *Id.* Andrew was not "injured" as a result of any "negligence" on the part of Sheriff's deputies in the processing area or at the ejection site. The "cause" of his injury, rather, was his decision, over two-hours after his ejection, to leave Fair property, and to cross I-4, twice. The Sheriff is therefore entitled to sovereign immunity for the additional reason that Plaintiff did not satisfy his burden of proving any operational

"negligence" on the part of the Sheriff's deputies in connection with Andrew's processing and ejection that caused him any injury.

## III. THE DISTRICT COURT ERRED IN ADMITTING HEARSAY TESTIMONY REGARDING STATEMENTS PURPORTEDLY MADE BY AN UNIDENTIFIED "OFFICER."

The District Court also erred as a matter of law in permitting Corey Thornton to testify regarding hearsay statements purportedly made by an "unknown" individual "dressed in green" who he referred to as an "officer." According to Thornton, the unidentified individual told Andrew and Corey they could be "arrested" if they remained at Gate 4 or attempted to re-enter the Fair, and that the "only thing" separating them from the Gate they were seeking was the "interstate highway." The District Court denied the Sheriff's motion in limine seeking to exclude the testimony as hearsay, and again denied defense counsel's objection to the testimony following a *voir dire* examination of Thornton regarding the statements. The reason for the denial: the statements were not hearsay because they were not offered "to prove the truth of the matter asserted." The Court ignored the defense's objection to the evidence on the basis of prejudice.

"Hearsay" is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *T. Harris Young & Assoc. v. Marquette Electronics, Inc.*, 931 F.2d 816, 826 (11th Cir. 1991). "The rationale behind the hearsay rule is the

untrustworthiness of hearsay statements." *Id.* Indeed, "reliability is the foundation upon which all exceptions to the hearsay rule are built." *United States v. Robinson*, 544 F.2d 110, 115 (2d. Cir. 1976). In this regard, "the rule against hearsay…has as its primary purpose the protection of the right of litigants to confront the witnesses against them and to test their credibility through cross-examination," which "has been described as 'the greatest legal engine ever invented for the discovery of truth.'" *See Colorificio Italiano Max Meyer, S.P.A. v. S/S Hellenic Wave*, 419 F.2d 223, 224 (5th Cir. 1969).

According to this Court, "[t]rial courts have an obligation to assess independently whether the ostensible non-hearsay purpose advanced by the proponent of the evidence is valid." *United States v. Issa*, 265 F. App'x 801, 806 (11th Cir. 2008) (citing *United States v. Sallins*, 993 F.2d 344, 346 (3rd Cir. 1993)). "Whether a disputed statement is hearsay," in turn, frequently turns on the purpose for which it is offered." *Sallins*, 993 F.2d at 346. According to the Third Circuit in *Sallins* (cited by this Court in *Issa*):

> If the hearsay rule is to have any force, courts cannot accept without scrutiny an offering party's representation that an out-of-court statement is being introduced for a material non-hearsay purpose. Rather, courts have a responsibility to assess independently whether the ostensible non-hearsay purpose is valid.

*Sallins*, 993 F.2d at 346.

"[T]he unidentifiability of a declarant is germane to the admissibility determination." *Miller v. Keating*, 754 F.2d 507, 510 (3rd Cir. 1985). "A party seeking to introduce such a statement carries a burden heavier than where the declarant is identified to demonstrate the statement's circumstantial trustworthiness." *Id.*; *see also Canton v. Kmart Corp.*, 470 F. App'x 79, 85 (3rd Cir. 2012) ("inability to identify the speaker of the statements…undermines any notion that this hearsay statement is reliable").

The District Court misapplied the Federal Rules of Evidence and therefore committed legal error when it permitted Thornton to testify regarding hearsay statements purportedly made by an unidentified individual dressed in green as evidence of negligence on the part of the Sheriff. *See Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1243 (11th Cir. 2020) (erroneous application of hearsay rule constitutes an abuse of discretion per se); *see also City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 556 (11th Cir. 1998) ("To the extent that a ruling of the district court turns on an interpretation of a Federal Rule of Evidence…our review is plenary."); *Sallins*, 993 F.2d at 344 (whether evidence is hearsay is a question of law subject to plenary review.").

The unidentified declarant's purported statements were offered for the "truth of the matter asserted" – that Andrew and Corey were not allowed to stay at Gate 4; that they could be arrested if they re-entered the Fair to access the Gate where their

ride was going to pick them up; and that they needed to go to the interstate to get to the Gate. The testimony was inherently prejudicial, moreover, because it allowed Plaintiff to close the two-hour gap between Andrew's ejection to Gate 4 and his decision to cross I-4, and therefore supplied the element of proximate causation otherwise missing from Plaintiff's evidence. The testimony was also unreliable in light of Thornton's inability to say whether the unidentified declarant was a Sheriff's deputy or a security guard.

The District Court's determination that the statements were not being offered for the "truth of the matter asserted" was therefore legal error. Plaintiff's failure to meet his "heavy burden" of proving the reliability of the testimony, given that the declarant was <u>unidentified</u>, compounded the Court's error. *Miller*, 754 F.2d 510 (party seeking to introduce statement of an unidentified declarant carries a heavier burden than where declarant is identified); *Canton*, 470 F. App'x at 85 (inability to identify speaker undermines any notion that statement is reliable).

But even if the statements were not hearsay, the District Court nevertheless erred in admitting the testimony because any probative value the statements may have had was plainly outweighed by the danger of unfair prejudice. *See, e.g., Allstate Ins. Co. v. James*, 845 F.2d 315, 321 (11th Cir. 1988) (district court reversibly erred where probative value of admitted testimony was substantially outweighed by its prejudicial effect). The probative value of the statements was minimal, if non-

existent, given Thornton's inability to identify the unknown individual, much less establish he was a Sheriff's deputy and not a security guard. And by the time the statements were purportedly made, Andrew was no longer being detained by law enforcement, and therefore any "duty" of care on the part of the Sheriff had ceased. The highly prejudicial effect of permitting the testimony, moreover, is undeniable, because the statements attributed to the unidentified declarant were the *only* "evidence" of proximate causation closing the two-hour gap between Andrew's ejection to Gate 4 and his death on I-4. The judgment on the wrongful death claim against the Sheriff should be reversed for this final reason.

## **<u>CONCLUSION</u>**

Appellee/Cross-Appellant respectfully request that the Court affirm the District Court's Order Denying Plaintiff's Motion for Judgment as a Matter of Law and Motion for New Trial on the Section 1983 claim against Corporal Clark, and reverse the judgment in Plaintiff's favor on his state law wrongful death claim against the Sheriff.

October 4, 2023

Respectfully submitted,

April S. Kirsheman, Esq. (FBN 66291)
Hillsborough County Sheriff's Office
2008 East 8th Avenue
Tampa, FL 33605
(813) 247-8185
(813) 242-1817 (fax)
akirsheman@hcso.tampa.fl.us

/s/Marie A. Borland
Marie A. Borland, Esq. (FBN 849784)
Robert A. Shimberg, Esq. (FBN 816043)
HILL WARD & HENDERSON, P.A.
101 E. Kennedy Blvd., Suite 3700
Tampa, FL 3361-2231
813.221.3900 – Telephone
813.221.2900 – Facsimile
marie.borland@hwhlaw.com
robert.shimberg@hwhlaw.com

Attorneys for Appellee/Cross-Appellant

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains 14, 340 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font.

Dated:  October 4, 2023.

s/ *Marie A. Borland*
*Counsel for Appellee/Cross-Appellant*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court

for the United States Court of Appeals for the Eleventh Circuit by using the appellate

CM/ECF system, which will send notice to all counsel of record on October 4, 2023.

/s/*Marie A. Borland*
*Marie A. Borland*
*Counsel for Appellee/Cross-Appellant*